**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Kurt Alexander | ) | |
| 523 Old Potomac Church Rd. | ) | |
| Stafford, VA 22554 | ) | |
| | ) | **Case No.:** |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Joint Base Andrews | ) | |
| 11 FSS/FSFR | ) | |
| 1191 Menoher Drive | ) | |
| JB Andrews, MD, United States; | ) | |
| | ) | |
| Frank Kendall, Secretary | ) | |
| Department of Air Force | ) | |
| 1670 Air Force Pentagon | ) | |
| Washington, DC 20330-1670; | ) | |
| | ) | |
| Jason Stack, | ) | |
| Elizabeth Rodenhauser, | ) | |
| Amanda Cubbage, | ) | |
| Jessica Nace, | ) | |
| Bryan Duggan, | ) | |
| (First name unknown) Nowicki, | ) | |
| (First name unknown) Nickolson, | ) | |
| (First name unknown) Wilson, | ) | |
| (First name unknown) Rowan, | ) | |
| Nicholas Budenz, | ) | |
| Paul Lombardi, | ) | **JURY TRIAL DEMANDED** |
| Spencer Doll, | ) | |
| Darrell Davis, | ) | |
| Courtney Holland, | ) | |
| (First name unknown) Arnold, | ) | |
| John Doe, and | ) | |
| Jane Doe, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| Serve: | ) | |
| | ) | |
| Attorney General of the United States | ) | |
| U.S. Department of Justice | ) | |

950 Pennsylvania Ave., NW )
Washington, DC 20530-0001 )
)
U.S. Attorney's Office (DAF) )
P.O. Box 197 )
Montgomery, AL 36101-0197 )
)
Lloyd J. Austin III, Secretary )
Department of Defense )
1000 Defense Pentagon )
Washington, DC 20301-1000 )
)
Office of the General Counsel )
U.S. Department of Air Force )
1740 Air Force Pentagon )
Washington DC 20330-1740 )
_____ )

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW Plaintiff, Kurt Alexander (hereinafter "Plaintiff" or "Mr. Alexander"), by and through his undersigned counsel, Dionna Maria Lewis, Esq., and complains against Defendants, Frank Kendall in his official capacity as Secretary of the United States Department of Air Force, and its subsidiary Joint Base Andrews, and Jason Stack, Elizabeth Rodenhauser, Amanda Cubbage, Jessica Nace, Bryan Duggan, (First name unknown) Nowicki, (First name unknown) Nickolson, (First name unknown) Wilson, (First name unknown) Rowan, Nicholas Budenz, Paul Lombardi, Spencer Doll, Darrell Davis, Courtney Holland, (First name unknown) Arnold, and other unknown John and Jane Does employed by Security Forces Squadron and the Office of Special Investigations operating as base police at Joint Base Andrews, in their individual capacities, and in support thereof states as follows:

## INTRODUCTION

1. This is an action authorized and instituted pursuant to the *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), 28 U.S.C. § 1367

and the Constitution of the United States, for the Defendants' constitutional violations pursuant to the Fourth Amendment of the Constitution of the United States.

## JURISDICTION AND VENUE

2. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically the Fourth Amendment of the Constitution of the United States and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), and the Constitution of the United States.

3. Venue is proper in the Maryland District Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events giving rise to the claim occurred at Joint Base Andrews, located in Prince George County, Maryland.

## NATURE OF THE ACTION

4. Plaintiff brings this action to secure protection of rights granted under the United States Constitution, and case law mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendants' violation of the United States Constitution, and case law.

5. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional rights.

6. This action seeks compensatory and punitive damages to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

7. Plaintiff, Kurt Alexander, is an African American male who resides in Stafford County, Virginia.

8. Defendant Joint Base Andrews is a United States military facility located in Prince George's County, Maryland. The facility is owned by the United States Department of Defense and operated by the United States Airforce.

9. Defendant Frank Kendall is Secretary of the United States Department of Air Force ("USAF"). USAF is the air service branch of the United States Armed Forces, and is one of the eight (8) uniformed branches of the United States.

10. Defendants Jason Stack ("Mr. Stack"), Elizabeth Rodenhauser ("Ms. Rodenhauser"), Amanda Cubbage ("Ms. Cubbage), Jessica Nace ("Ms. Nace"), Bryan T. Duggan ("Mr. Duggan"), Nowicki, Nickolson, Wilson, and Rowan, are employed by Security Forces Squadron, Joint Base Andrews, Prince George County, Maryland.

11. Defendants Nicholas Budenz ("Mr. Budenz"), Paul Lombardi ("Mr. Lombardi"), Spencer Doll ("Mr. Doll"), Darrell Davis ("Mr. Davis"), Courtney Holland ("Ms. Holland"), and Arnold are employed by the Office of Special Investigations ("OSI"), Joint Base Andrews, Prince George County, Maryland.

12. Defendants John and Jane Doe are employed by Security Forces and/or OSI, Joint Base Andrews, Prince George County, Maryland.

13. Mr. Alexander is now separated from the FPS based on medical reasons. During the relevant period, Plaintiff lived on Joint Base Andrews as a government civilian employee and worked in Washington, D.C. Mr. Alexander is entitled to the protections of the Constitution of the United States of America.

4

## FACTUAL ALLEGATIONS

14. Plaintiff, Kurt Alexander, has served as a Law Enforcement Officer for the Federal Protective Services ("FPS"), Department of Homeland Security ("DHS"), from 2010 until November 2023.

15. At the relevant time, Mr. Alexander resided on Joint Base Andrews ("JBA") with his wife and four children in privatized military housing at 5150A Jerstad Court, Joint Base Andrews, MD 20762.

16. On or about April 14, 2021, Mr. Alexander met "Mr. B" (first and last name withheld), the adult son of a neighbor, Mrs. N (First and last name withheld), who lived several houses down from the Alexanders. Mr. B was not a resident on the base. Mr. B had in his possession on the base an AK-47 rifle and a pistol.

17. On or about April 27, 2021, in a subsequent conversation with Mrs. N, she informed Mr. Alexander that Mr. B may have mental health issues, and she confirmed to Mr. Alexander that Mr. B was in possession of the above-mentioned firearms when he previously met Mr. Alexander. Mr. Alexander subsequently spoke with Mr. B who confirmed that he was on Joint Base Andrews with the aforementioned firearms two weeks prior.

18. On the evening of April 28, 2021, Mr. Alexander was off duty and home alone with his children while his wife was out of town. At approximately 7:30 p.m., a series of phone calls unfolded between Mr. Alexander and JBA Security Forces, wherein Mr. Alexander contacted Security Forces to advise them that he was aware that an individual, Mr. B, was on base two weeks earlier with two illegal firearms. In the initial phone calls between Mr. Alexander and Anthony Harmon of Security Forces, Mr. Alexander was hesitant to share more details of

Mr. B's identity. This caused friction with Mr. Harmon who wanted Mr. Alexander to report to the police station to write a statement.

19. At approximately 10:00 p.m., Air Force Special Agent Mr. Doll called FPS dispatch to inquire about Mr. Alexander's employment status. The FPS operator answered asking "What's your emergency," to which Mr. Doll responded, "This is not an emergent call."

20. At approximately 10:41 p.m., Mr. Doll called FPS dispatch again to report that Mr. Alexander was allegedly acting suspicious. Again he reported that it was "not an emergent call."

21. Despite Mr. Doll's assertions that the call was not emergent, records reflect that Mr. Alexander allegedly called at approximately 10:30 p.m. and was described as having a Mental health crisis, and the records further reflect that Air Force Security Forces and OSI personnel were allegedly concerned that Mr. Alexander was planning on ambushing them.

22. Upon confirming with Mr. B directly that he was in fact previously on the base with firearms, Mr. Alexander offered to fully divulge Mr. B's name and description to Security Forces, but was instead advised that someone was en route to meet him. Mr. Alexander advised the investigator that he had taken some medication (Benadryl) that made him drowsy. The investigator asked if it was "anti-psychotic" medication and Mr. Alexander advised that it was not. JBA Police asked Mr. Alexander to meet the arriving team outside of his house.

23. Following these initial calls, Mr. Alexander was contacted on the phone by Security Forces Commander Stack, and OSI Special Agent Budenz. Mr. Alexander divulged to them the details regarding the incident with Mr. B. Mr. Stack and Mr. Budenz asked Mr. Alexander if he could come speak to them outside about the incident. Given the nature of the information he was sharing, and the fact that Mrs. N lived in such close proximity, Mr. Alexander did not

wish to be seen speaking with the police outside of his house. He advised that if he was seen talking to the police he would not be able to get any more information for them. Mr. Alexander suggested that if they wanted to meet him, they would have to meet somewhere away from his house. Mr. Alexander advised what type of clothing he was wearing so that he could be identified.

24. Based on information and belief, JBA Police misrepresented these and other conversations, and fabricated a narrative that Mr. Alexander was a potential threat to police, neighbors, his children, and household. JBA Police escalated the situation, notifying FPS and the FBI of the situation. JBA Police called up Security Forces Member Ms. Nace, a hostage negotiator, in the event that the situation turned into a barricaded event.

25. Later in the evening of April 28th, JBA Police contacted James Wilson, FPS Area Commander, for assistance, advising that Mr. Alexander was acting suspicious, off his medication, and home alone with his children. JBA Police advised that they were going to conduct a welfare check for the children. Mr. Wilson contacted Sterling Proctor, Mr. Alexander's fourth level supervisor at FPS, asking him to assist JBA Police and advising him of the information reported above.

26. As JBA Police awaited the arrival of FPS agents to make contact with Mr. Alexander, they set up a covert perimeter around Mr. Alexander's neighborhood in preparation for a violent encounter. Based on information and belief, this group included Security Forces Members (Mr. Stack, Ms. Rodenhauser, Ms. Cubbage, Ms. Nace, Mr. Duggan, Nowicki, Nickolson, Wilson, and Rowan), OSI Special Agents (Mr. Budenz, Mr. Lombardi, Mr. Davis, and Mr. Doll), FPS members, and other unknown on duty Security Forces personnel.

7

27. Based on information and belief, a team consisting of Ms. Cubbage, Nowicki, Nickolson, and a Military Working Dog ("MWD") proceeded to a concealed location in order to cover a field behind Mr. Alexander's home in case anything went wrong

28. On April 29, 2021, at 1 a.m., Mr. Alexander was contacted by Mr. Proctor and advised to come outside. As he exited his house to meet FPS and JBA Police on their orders, Mr. Alexander was asked to show his hands and was surrounded by FPS Supervisor Mr. Proctor, FPS Supervisor Samuel Bell, and one (1) other FPS personnel, and Security Forces Commander Mr. Stack who was wearing a helmet. Behind Mr. Alexander was a fence. He was cornered by law enforcement.

29. As the detainment unfolded, Mr. Stack pressured Mr. Alexander to allow him to search his house under the premise that he wanted to ensure the safety of Mr. Alexander's children. There was no warrant for Plaintiff's arrest or to search Plaintiff's residence. Mr. Alexander was reluctant at first, but ultimately agree to allow Air Force personnel to enter his house under the pretense of conducting a "safety check" for his children. Mr. Alexander's consent was given under duress and was not given voluntarily.

30. Mr. Alexander expressed that he needed to go check on his children, and heard voices yelling stating, "You cannot go back in there by yourself". FPS personnel and Mr. Stack then move around Mr. Alexander to control his movement.

31. Mr. Alexander was then surrounded by at least seven (7), and possibly more, Security Force and OSI members with night vision scopes on their rifles, tactical helmets with night vision, rifle resistant armor, and a police K-9. Based on information and belief, included in this group were Security Forces personnel Ms. Nace, Ms. Rodenhauser, and Mr. Duggan and OSI personnel Mr. Budenz, Mr. Lombardi, Mr. Davis, and Mr. Doll.

32. Mr. Stack, Ms. Rodenhauser, Ms. Nace, FPS and other Security Forces / OSI personnel then escorted Mr. Alexander to his house to conduct the "safety check." Mr. Alexander did not allow FPS personnel to enter his house.

33. Mr. Alexander was detained on the first floor of his residence with Mr. Bell watching over him, and a female Air Force Investigator, believed to be Ms. Nace, nearby. At all times the officers supervised Mr. Alexander within five (5) feet. The safety check took an extremely long time, and Mr. Alexander inquired if he could check on his children on the second floor and was denied by the female Air Force investigator.

34. Based on information and belief, under the presumed authority granted by the safety check, FPS accompanied JBA Police into Mr. Alexander's house to conduct a further search of the residence. This was outside of the scope of the consent Mr. Alexander had given to Mr. Stack while under duress. Mr. Bell advised Mr. Alexander that they would retrieve his FPS-issued guns. Mr. Alexander was escorted to his bedroom where his gun safe was located, and directed to open the safe. Mr. Alexander was restricted from handling any firearms.

35. Based upon information and belief, Mr. Bell, along with Wilson and Rowan, retrieved Mr. Alexander's FPS-issued firearms and his personal firearms and then transferred custody of his personal firearms to Security Force members in the house. The following firearms were recovered from Mr. Alexander's bedroom:: two (2) agency firearms; one (1) agency taser; and nine (9) personal firearms. Mr. Alexander's personal firearms were retained by JBA Security Forces Police. On information and belief these firearms were stored at Security Forces armory.

36. Mr. Alexander did not consent to the search of his bedroom and safe. Based on information and belief, Defendants' practice and protocol should have provided him with a hearing to

determine if his firearms had been properly confiscated under the premise of Mr. Alexander having an alleged mental health crisis. No hearing was held to determine whether the seizure of Mr. Alexander's personal firearms was proper, and whether JBA Police could retain them. They were eventually returned approximately five (5) days later.

37. Mr. Alexander was then escorted out of his residence where he was interrogated and surrounded by seventeen (17) Air Force law enforcement and three (3) FPS agents. He shared the same facts regarding Mr. B that he had previously shared with JBA Police, Commander Stack, and Agent Budenz over the phone.

38. During his interrogation one of Mr. Alexander's minor children called him crying as there was no other adult at home and she could not find him. Three of his four children woke up and saw police lights around their house. JBA Police and FPS escorted Mr. Alexander back into his residence to comfort her. While Mr. Alexander was comforting his daughter, he was not free to leave the presence of the attending agents.

39. By the time Mr. Alexander was escorted back into his house, the check of his children was complete, his firearms were confiscated, and Air Force law enforcement had identified that Mr. Alexander's wife was not at home.

40. Mr. Alexander was then ordered by Mr. Bell to call his wife. This was done under duress. Mr. Alexander called his wife and Mr. Bell asked her where she was and if she was safe. Mr. Bell handed the phone to an Air Force investigator who asked Mr. Alexander's wife a few more standard questions. It was confirmed that Mr. Alexander's wife was unharmed.

41. Following this questioning, FPS and JBA Police departed from the residence without incident, having determined that Mr. Alexander was not a threat and there was no mental

health crisis or barricade situation. Mr. Proctor sent emails to FPS parties advising that Mr. Alexander was not a threat to himself or others.

42. During the incident, at all times Mr. Alexander's movement was under the watch and control of various Air Force personnel including all of the previously named and unknown Security Forces and OSI personnel, who were armed and acting under the color of law.

43. Although the basis for the encounter was Mr. Alexander allegedly experiencing a mental health crisis, no EMS responded to his house and Mr. Alexander was not sent for a mental evaluation.

44. Mr. Alexander was never asked if he needed mental health assistance, he was never searched for weapons, he was never asked to clarify any of his previous alleged statements which were the basis of the encounter, and no report from the Air Force or FPS articulates what crime he was suspected of committing.

45. No Air Force report concluded that Mr. Alexander was having a mental health crisis. Furthermore no report articulated why a two hours detainment was necessary based on the allegations.

46. The entire detainment occurred from approximately 1 a.m. until 3 a.m.

47. Mr. Alexander was placed on administrative leave for approximately ten days from April 29, 2021 through May 8, 2021, **Ex. A**. Mr. Alexander was then placed on administrative duties from May 9, 2021 until February 25, 2022, **Ex. B**, while an internal agency investigation was ongoing. During that approximately nine (9) month period Mr. Alexander's law enforcement authority was suspended, his agency authorization to carry a firearm was suspended, and he was placed on administrative duty. He was not allowed to work night

shifts and could only work day shifts. As a result, Mr. Alexander suffered $13,561.27 in lost wages.

48. Mr. Alexander was traumatized and humiliated by the treatment he received from the Defendants, impacting him both professionally and personally. As a result of the aforementioned action, Plaintiff has suffered irreparable harm and injury including but not limited to: severe emotional distress, pain and suffering, lost wages, adverse employment treatment, and damage to his professional reputation. Mr. Alexander's police powers were suspended for an excess of nine (9) months. FPS eventually cleared Mr. Alexander for full law enforcement duty without him undergoing a mental health evaluation.

49. Plaintiff is now forced to file suit due to the Defendants' inability to remedy their unlawful conduct, ultimately costing Plaintiff significant financial strain as well as emotional distress.

### <u>COUNT I</u>
**BIVENS CLAIM – FOURTH AMENDMENT**

50. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

51. The Fourth Amendment of the U.S. Constitution provides that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…."

52. In the seminal case *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."

53. Here, known Security Forces personnel (Mr. Stack, Ms. Rodenhauser, Ms. Cubbage, Ms. Nace, Mr. Duggan, Nowicki, Nickolson, Wilson and Rowan), other unknown on duty

Security Forces personnel, OSI personnel (Mr. Budenz, Mr. Lombardi, Mr. Davis, and Mr. Doll), and FPS agents, acting under the color of their authority violated Plaintiff's Fourth Amendment rights when, without reasonable suspicion, probable cause, a warrant, or in relation to any criminal offense, they lured Plaintiff out of his house and surrounded him with twenty armed agents, subjected Plaintiff to an excessive show of force, detained Plaintiff to the point of a De Facto Arrest, searched his house without a warrant or probable cause, terrified his children, unlawfully confiscated his firearms, unlawfully restricted Plaintiff's movement, unlawfully trespassed on Plaintiff's property, and took part in an unlawful search lasting over two hours.

54. At all times, from approximately 1 a.m. until 3 a.m., Defendants controlled all of Plaintiff's movements. Plaintiff's personal firearms were confiscated during the incident and were not returned for approximately five (5) days.

55. As a direct and proximate cause of Defendants' conduct alleged above, Plaintiff suffered and continues to suffer damages as a result of the violation of his Constitutional Rights. Plaintiff has suffered severe emotional distress, pain and suffering, lost wages, adverse employment treatment, and damage to his professional reputation as it relates to his employment with the FPS and as a law enforcement officer.

56. Defendants are jointly and severally liable for Plaintiff's injuries.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Kurt Alexander, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgment finding that the foregoing actions of Defendants violated the 4th Amendment of the Constitution of the United States;

b. Enter a declaratory judgment that Defendants are jointly and severally liable for Plaintiff's injuries;

c. Award compensatory damages in the amount of $500,000 that would fully compensate Plaintiff for the loss of reputation, loss of career advantage, pain and suffering, mental and emotional distress, physical and psychological injury, humiliation, and embarrassment caused by the conduct of the Defendants alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: April 26, 2024

Respectfully submitted,

By: /s/ Dionna Maria Lewis
Dionna Maria Lewis, Esq.
Bar No. 219016
District Legal Group, PLLC
700 Pennsylvania Ave. SE, Suite 2098
Washington, D.C. 20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff*

By: /s/ Stephen Fowler
Stephen Fowler, Esq.
Bar No. 31084
District Legal Group, PLLC
700 Pennsylvania Ave. SE, Suite 2098
Washington, D.C. 20003
Tel: (803) 446-2911
Stephen@DistricLegalGroup.com
*Counsel for Plaintiff*