## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

KURT ALEXANDER,

      Plaintiff,

  v.

JASON STACK,
ELIZABETH RODENHAUSER,
AMANDA CUBBAGE,
JESSICA NACE,
BRYAN DUGGAN,
NOWICKI,
NICKOLSON,
WILSON,
ROWAN,
NICHOLAS BUDENZ,
PAUL LOMBARDI,
SPENCER DOLL,
DARRELL DAVIS,
COURTNEY HOLLAND,
ARNOLD,
JOHN DOE and
JANE DOE,

      Defendants.

Civil Action No. 24-1240-TDC

---

## MEMORANDUM OPINION

Plaintiff Kurt Alexander has filed a civil action against 17 individuals who are employees of either the United States Air Force Security Forces or the United States Air Force Office of Special Investigations in which he asserts a federal constitutional claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) arising from an April 2021 incident at Joint Base Andrews in Prince George's County, Maryland in which Defendants allegedly detained Alexander, searched his home, subjected him to an excessive show

of force, and seized certain firearms from the home. Defendants have filed a Motion to Dismiss or for Summary Judgment, which is now fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Dismiss will be GRANTED, and this case will be DISMISSED.

## BACKGROUND

In the Complaint, Alexander alleges the following relevant facts, which the Court accepts as true for purposes of the resolution of the Motion.

From 2010 to 2023, Alexander served as a law enforcement officer for the Federal Protective Service ("FPS"), a component agency of the United States Department of Homeland Security ("DHS"). In April 2021, Alexander resided with his wife and children in privatized military housing on Joint Base Andrews ("JBA") as a civilian government employee.

On or about April 14, 2021, Alexander met an individual he identifies only as "Mr. B," the adult son of one of his neighbors on JBA, who had in his possession an AK-47 rifle and a pistol. Compl. ¶ 16, ECF No. 1. Alexander later learned from Mr. B's mother that Mr. B may have mental health issues.

On the evening of April 28, 2021, Alexander initiated a series of phone calls with the JBA Security Forces ("JBASF") to report that Mr. B had possessed two illegal firearms on the base two weeks earlier. The JBASF is part of the United States Air Force Security Forces, which operate as the police force on Air Force bases such as JBA and are responsible for, among other activities, ensuring the safety of all weapons on an Air Force base. Alexander first spoke with Anthony Harmon, a member of the JBASF, who wanted him to provide more detail about Mr. B's identity than he was then willing to provide. At approximately 10:00 p.m., Defendant Spencer Doll, an agent with the Air Force Office of Special Investigations ("OSI"), which provides criminal

2

investigative services to the Air Force, called FPS to ask about Alexander's employment status while acknowledging that there was no emergency.

According to relevant records, Alexander made another phone call at approximately 10:30 p.m. that caused the JBASF and OSI to become concerned that Alexander was having a mental health crisis and was planning to ambush them. During this call, Alexander offered to disclose Mr. B's identity and provide a description of him to a JBASF investigator, but the investigator told Alexander that someone was already on the way to his home to meet him. Alexander told the investigator that he had recently taken some medication, Benadryl, which would make him drowsy. At approximately 10:41 p.m., Doll again called FPS and reported that Alexander was "acting suspicious." *Id.* ¶ 20.

At that point, Defendant Commander Jason Stack of the JBASF and Defendant Special Agent Nicholas Budenz of OSI called Alexander from outside his house and asked if he would come out to speak with them. Alexander provided them with more details about Mr. B over the phone but stated that he did not want to be seen outside of his home with police because of how close Mr. B lived to him. Alexander asserts that based on these conversations, the JBASF and OSI "fabricated a narrative that [he] was a potential threat to police, neighbors, his children, and household." *Id.* ¶ 24. As a result, the JBASF contacted an FPS Area Commander to request FPS assistance at the scene, stated that Alexander "was acting suspicious" and was "off his medication," and advised that they were planning to conduct "a welfare check" of Alexander's children, who were with him inside the home. *Id.* ¶ 25. According to Alexander, while waiting for FPS personnel to arrive, a group of JBASF and OSI personnel, consisting largely of the defendants in this case, "set up a covert perimeter around" Alexander's neighborhood "in preparation for a violent encounter." *Id.* ¶ 26.

On April 29, 2021 at approximately 1:00 a.m., Alexander's fourth-level FPS supervisor, Sterling Proctor, contacted him and asked him to come out of his home. When Alexander did so, he was surrounded by FPS, JBASF, and OSI personnel. The law enforcement officers did not have a warrant for Alexander's arrest or to search his home, but Commander Stack "pressured" Alexander to consent to a search of his house "under the premise that" the officers wanted to conduct a "safety check" on Alexander's children. *Id.* ¶ 29. Alexander consented, but he now asserts that he did so "under duress" and not voluntarily. *Id.* When Alexander stated that he needed to go back into the house to check on his children, he was told he could not go back in by himself and was then surrounded by a group of at least seven JBASF and OSI personnel, including Defendants, who had "night vision scopes on their rifles, tactical helmets with night vision, rifle resistant armor, and a police K-9." *Id.* ¶ 31.

While the law enforcement officers conducted the safety check on the children, Alexander was detained on the first floor in that he was being watched by another FPS supervisor, Samuel Bell, and Defendant Jessica Nace of the JBASF. FPS and JBASF personnel, including Bell and Defendants Wilson and Rowan, then conducted a further search of the residence, including by escorting Alexander to his bedroom, from which they seized Alexander's personal and FPS-issued firearms. Alexander received his firearms back five days later.

After the seizure of his firearms, Alexander was escorted out of his house where he was "interrogated and surrounded by" 17 JBASF and OSI law enforcement officers and 3 FPS agents. *Id.* ¶ 37. These officers later escorted Alexander back into his house so he could comfort his daughter, questioned him about his wife, and departed his home at 3:00 a.m. after determining that he was not a threat. FPS subsequently placed Alexander on administrative leave from April 29, 2021 through May 8, 2021 and on administrative duties, without law enforcement authority or

4

authorization to carry a firearm, from May 9, 2021 until February 25, 2022, during which it conducted an internal investigation. Alexander was then cleared to return to law enforcement duties, but he separated from FPS in November 2023 based on medical reasons.

In his Complaint, Alexander asserts a claim under *Bivens* in which he alleges that Defendants violated his constitutional rights under the Fourth Amendment to the United States Constitution when they detained him, searched his home without probable cause or a warrant, subjected him to an excessive show of force, and seized his firearms.

## DISCUSSION

In their Motion to Dismiss or for Summary Judgment, Defendants argue that: (1) this case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5) because Alexander has failed to serve properly all of the individual Defendants; (2) Alexander's *Bivens* claim is foreclosed by recent United States Supreme Court precedent; and (3) even if the *Bivens* claim is viable, Defendants are entitled to qualified immunity. Where the Court agrees that Alexander's *Bivens* claim must be dismissed, it need not and will not consider Defendants' arguments relating to improper service and qualified immunity.

## I. Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

5

allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Although a party may move for summary judgment before the commencement of discovery, *see* Fed R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The proper procedure for seeking discovery prior to a summary judgment ruling is to file a declaration pursuant to Rule 56(d) stating why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* Here, Alexander has filed a declaration that adequately asserts a need for discovery before consideration of summary judgment. The Court therefore declines to treat Defendants' Motion as a Motion for Summary Judgment and instead will treat it only as a Motion to Dismiss under Rule 12(b)(6).

On a Rule 12(b)(6) motion, however, courts are permitted to consider facts and documents subject to judicial notice without converting the motion into a motion for summary judgment. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds*, *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015). "Under this exception, courts may consider 'relevant facts obtained from the public record,' so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint." *Id.* (quoting *B.H. Papasan v. Allain*, 578 U.S. 265, 283 (1986)); *see also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts at any stage of a proceeding may judicially notice a fact that is not subject to reasonable dispute, provided that the fact is generally known within the court's territorial jurisdiction or can be accurately and readily

6

determined from sources whose accuracy cannot reasonably be questioned." (quoting Fed. R. Evid. 201). Accordingly, the Court will take judicial notice of the exhibits attached to the Motion, as well as other related agency guidance, which consist of material from official federal government websites. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that under Federal Rule of Evidence 201, courts "routinely take judicial notice of information contained on state and federal government websites"); *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (noting that courts "may take judicial notice of documents from official government websites" when considering a Rule 12(b)(6) motion to dismiss).

## II. *Bivens* Claim

Defendants argue that Alexander's *Bivens* claim must be dismissed based on the Supreme Court's ruling in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), because the claim arises in a new *Bivens* context, and special factors counsel against extending *Bivens* to this context.

In *Bivens*, six agents of the Federal Bureau of Narcotics entered the plaintiff's apartment and arrested him, handcuffed him in front of his wife and children, threatened to arrest his entire family, and searched his apartment. *Bivens*, 403 U.S. at 389. The agents then took the plaintiff to a courthouse "where he was interrogated, booked, and subjected to a visual strip search." *Id.* The plaintiff sued the agents, alleging that the warrantless arrest and search were improper and that they used unreasonable force in arresting him. *Id.* The Supreme Court held that the plaintiff had a cause of action for damages under the Fourth Amendment. *Id.* at 397. The Court expanded the scope of such implied causes of action for constitutional violations in two subsequent cases. In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court held that a former congressional staff member who asserted a sex discrimination claim under the Fifth Amendment had an implied cause of action for damages. *Id.* at 231, 248–49. In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme

7

Court held that the estate of a federal prisoner who died in custody had an implied cause of action for damages under the Eighth Amendment based on alleged deliberate indifference to serious medical needs. *Id.* at 16 & n.1, 18–19, 25.

In *Egbert*, the owner of a hotel in Washington state immediately adjacent to the Canadian border asserted federal constitutional claims against a United States Border Patrol agent who lifted the hotel owner off the ground, threw him against a vehicle, and threw him to the ground, then allegedly retaliated against him by reporting his license plate "SMUGLER" for referencing illegal conduct and by contacting the Internal Revenue Service and prompting an audit of the hotel owner's tax returns. *Egbert*, 142 S. Ct. at 1801–02. The plaintiff asserted claims under *Bivens* for excessive force under the Fourth Amendment and retaliation under the First Amendment. *Id.* at 1802. In declining to permit these *Bivens* claims to proceed, the Supreme Court noted that it now views "[r]ecognizing a cause of action under *Bivens*" to be "a disfavored judicial activity" because of its view that Congress, not the courts, should establish causes of actions for damages arising under the Constitution. *Id.* at 1802–03 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).

The Court thus held that a two-step inquiry governs whether a *Bivens* claim may proceed. *Id.* at 1803. First, a court asks whether the case presents "a new *Bivens* context" in that it is "'meaningful[ly]' different from the three cases in which the [Supreme] Court has implied a damages action." *Id.* (quoting *Ziglar*, 582 U.S. at 139). Among the potential differences to be considered are:

the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

8

*Ziglar v. Abbasi*, 582 U.S. 120, 139–40 (2017). A new context can also arise in a case involving a "new category of defendants." *Egbert*, 142 S. Ct. at 1803 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Ziglar*, 582 U.S. at 136). Such special factors can include whether there is uncertainty over the "systemwide consequences of recognizing a cause of action under *Bivens*" and whether "Congress already has provided, or has authorized the Executive [Branch] to provide, 'an alternative remedial structure,'" either of which alone could foreclose relief. *Id.* at 1804 (quoting *Ziglar*, 582 U.S. at 137). The Court further observed that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Under these principles, the *Egbert* Court held that the Fourth Amendment claim failed because while Bivens had recognized a Fourth Amendment excessive force cause of action, the Court of Appeals had already "conceded" that the plaintiff's claim "presented a new context for *Bivens* purposes," *id.* at 1804, and there were special factors weighing against recognizing a new cause of action, specifically, (1) that the claim was brought against a Border Patrol agent and occurred at or near the international border, and "Congress is better positioned to create remedies in the border-security context"; and (2) the Government had "already . . . provided alternative remedies that protect plaintiffs" consisting of a statutory requirement that the Border Patrol control, direct, and supervise all employees, as well as regulations requiring that the Border Patrol investigate alleged violations of the standards for enforcement activities and accept grievances from anyone who wishes to lodge a complaint. *Id.* at 1804, 1806–07.

9

**A.    New Context**

Alexander argues that his claim does not present a new context because it arises under the same constitutional provision as the claim in *Bivens* and similarly involves an allegedly unconstitutional detention of an individual and a search of his home. *See Bivens*, 403 U.S. at 389. The Supreme Court, however, has noted that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020), and even if it has "significant parallels" to a previously recognized *Bivens* claim, *Ziglar*, 582 U.S. at 147. Here, the category of defendants in this case, combined with the military context in which the claim arises, renders Alexander's claim meaningfully different from *Bivens*.

Ordinarily, the mere existence of factual differences from *Bivens* itself, such as the federal agency that employs the defendants or the factual setting for the allegedly unconstitutional conduct, is not sufficient to create a new context. *See Hicks v. Ferreyra*, 965 F.3d 302, 306, 311 (4th Cir. 2020) (although declining to consider the claim that there was a new *Bivens* context because that argument was not preserved for appeal, stating that the case was effectively a "replay" of *Bivens* even though the defendants were United States Park Police officers and the misconduct involved twice conducting traffic stops of the plaintiff, a United States Secret Service special agent, without probable cause or reasonable suspicion). Courts, however, have found that a Fourth Amendment *Bivens* claim arises in a new context when the defendants were acting under authorities different from those of standard federal civilian law enforcement officers. *See, e.g.*, *Tun-Cos v. Perrotte*, 922 F.3d 514, 523–25 (4th Cir. 2019) (finding that a *Bivens* claim against U.S. Immigration and Customs Enforcement agents charged with enforcing immigration laws presented a new context); *see also Egbert*, 142 S. Ct. at 1804–05 (finding, in relation to the special

10

factors analysis, that a *Bivens* claim was unavailable in part based on the fact that the defendant was a Border Patrol agent carrying out border-related authorities with national security implications).

In *Doe v. Meron*, 929 F.3d 153 (4th Cir. 2019), the plaintiff, a federal civil servant, asserted *Bivens* claims arising out of an investigation into whether he abused and neglected his three minor children while residing at a United States Navy installation. *See id.* at 161–62. The plaintiff asserted claims against civilian and military employees of the United States Navy and the United States Department of Defense ("DOD") under the Fourth and Fifth Amendments, including Fourth Amendment claims relating to the alleged seizure, interrogation, and "batter[y]" of him and his children. *Id.* at 162. In concluding that the Fourth Amendment *Bivens* claims presented a new context, the United States Court of Appeals for the Fourth Circuit stated that "in contrast to *Bivens*, these defendants were officers in the United States Navy or employees of the Department of Defense, operating under naval regulations." *Id.* at 169.

Similarly, Alexander's claims arise from  a detention and search occurring on a military base conducted by United States Air Force employees operating under legal guidance issued by the Air Force. *See* Department of the Air Force, Air Force Instruction 31-118, Security Forces Standards and Procedures § 1B (Aug. 18, 2020), https://static.e-publishing.af.mil/production/1/af_a4/publication/afi31-118/afi31-118.pdf (outlining the "Roles and Responsibilities" of the Security Forces); Department of the Air Force, Air Force Policy Directive 71-1, Criminal Investigations and Counterintelligence § 3.2 (July 1, 2019), https://static.e-publishing.af.mil/production/1/saf_ig/publication/afpd71-1/afpd71-1.pdf (outlining the "Roles & Responsibilities" of OSI).  Where Defendants were acting as law enforcement carrying out activities on a military base pursuant to Defendants' duties to protect

11

that base, this case is sufficiently different from *Bivens* such that it presents a new context. *See Doe*, 929 F.3d at 169; *Ellawendy v. Takagaki*, 646 F. Supp. 3d 1153, 1159 (N.D. Cal. 2022) (concluding that a plaintiff's Fourth Amendment *Bivens* claim presented a new context where the claim arose "from actions purportedly taken by a police officer assigned to a military installation as part of an investigation" and contained "a military/D[O]D throughline . . . that is not found in *Bivens*"); *see also Tun-Cos*, 922 F.3d at 525 (noting that "military officers" generally qualify as a "*new category* of defendants" that make a case "meaningfully distinct from the three *Bivens* cases" (quoting *Ziglar*, 582 U.S. at 135)).

## B. Special Factors

Having found that Alexander's claim arises in a new *Bivens* context, the Court next examines whether special factors reveal that "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 582 U.S. at 136). Two special factors weigh against extending *Bivens* to Alexander's claim. First, as discussed above, *see supra* part II.A, Alexander's claim arises "in a military context," which the Fourth Circuit has recognized as constituting a special factor that warrants denying an extension of *Bivens*. *Doe*, 929 F.3d at 169; *see also Ellawendy*, 646 F. Supp. 3d at 1161 (in assessing whether special factors existed, noting that "lower courts have declined to extend *Bivens* in the military context, even when the plaintiffs were not current or former active-duty members of the military").

Second, there appears to be an alternative remedial structure to address Alexander's grievances. *See Egbert*, 142 S. Ct. at 1804 ("If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" (quoting *Ziglar*, 582 U.S. at 137)). Specifically, Alexander can

12

submit a complaint to the Air Force Office of the Inspector General "if [he] reasonably believe[s] inappropriate conduct has occurred, or a wrong or violation of law . . . has been committed . . . ." Department of the Air Force, Air Force Instruction 90-301, Inspector General Complaints Resolution § 2B, 2.4.3.6 (Jan. 4, 2024), Joint Record ("J.R.") 49, ECF No. 58-1; *see also id.* § 2B, 2.4.1, J.R. 48 (noting that "(a)ny person may file a complaint with the Inspector General"); *see also* 10 U.S.C. § 9020(b) (stating that the Air Force Inspector General shall "inquire into and report upon the discipline, efficiency, and economy of the Department of the Air Force" "[w]hen directed by" the Secretary, the Chief of Staff, or the Chief of Space Operations of the Air Force); Department of the Air Force, Air Force Policy Directive 90-3, Inspector General §§ 1.1, 2.1.3, 2.1.4 (Feb. 3, 2021), https://static.e-publishing.af.mil/production/1/saf_ig/publication/dafpd90-3/dafpd90-3.pdf (noting that the policy directive implements 10 U.S.C. § 9020, that it is Air Force "policy to [p]rovide a credible, independent, and responsive Complaint Resolution Program," that the Air Force Inspector General "[i]ssues policy guidance and direction for the" Air Force "Inspection System and Complaints Resolution Program," and that it "[d]irects, conducts, recommends, or delegates Inspector General investigations").

Other courts have concluded that similar complaint resolution procedures administered by Inspectors General of federal agencies constitute alternative remedial structures that militate against extending *Bivens*. *See Pettibone v. Russell*, 59 F.4th 449, 456 (9th Cir. 2023) (describing the DHS Inspector General "grievance procedure" as "comparable to the remedy deemed adequate in *Egbert*"); *Ellawendy*, 646 F. Supp. 3d at 1160–61 (finding that the investigative authorities of the United States Army Inspector General qualified as an alternative remedial structure). Although Alexander disputes the adequacy of the Air Force Inspector General remedial structure, *Egbert* recognized that "[s]o long as Congress or the Executive has created a remedial process that it finds

13

sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy," even if a court "independently concludes" that the remedial alternative is not as effective as a damages remedy. *Egbert*, 142 S. Ct. at 1807. Accordingly, the Court finds that the Air Force Inspector General's complaint process constitutes an alternative remedial structure that counsels against extending *Bivens* to Alexander's claim.

Where Alexander's claim presents a new *Bivens* context and implicates special factors that warrant against extending *Bivens*, the Court must dismiss it.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED, and this case will be DISMISSED. A separate Order shall issue.

Date:   July 25, 2025

THEODORE D. CHUANG
United States District Judge

14